## Gordon, Appellant, *v.* Braeburn Alloy Steel Corporation.

Argued April 19, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*S. Harold Grossman,* with him *Joseph M. Loughran,* for appellant.

*Robert W. Smith,* with him *Smith, Best & Horn,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, May 22, 1950:

In this action by an employe against his employer to recover sums alleged to have been wrongfully deducted from his earnings the question is whether the trial court was justified in directing, as it did, a verdict for defendant.

Braeburn Alloy Steel Corporation, the defendant, manufactures high-grade tool steel. Frank J. Gordon, the plaintiff, has been in its employ since 1927. Originally the "roller" operating each of the two rolling mills in the plant was paid by defendant a certain price for the finished steel based on the amount of production; out of what he received he paid the nine members of his crew. Plaintiff was originally a "straightener" and later a "rougher"; the roller under whom he worked was one James Dunbar. When the Social Security Act went into effect this plan of operation was changed in order to make it possible for the members of the crew to be entitled to social security; they became direct employes of defendant and earnings were divided among them according to an agreed upon schedule of percentages known as the "distribution of tonnage rates". In that same year a Local of the United Steel Workers of America was organized in defendant's plant; plaintiff became, and has ever since remained, a member of it. On March 15, 1940 a collective bargaining agreement was entered into between defendant and the Union which set forth rates of pay and other conditions of employment; it was stated therein that it was the intention of the contract to preserve the then existing scale of wages, and, for the purpose of clarification of the tonnage rates, a schedule of such rates was attached; the share assigned to the roller was 28½%, the remaining 71½%

being distributed among the other members of the crew. This agreement was renewed, with some modifications, on April 19, 1941, on March 9, 1943 and on June 15, 1945; the tonnage rates were changed as of January 30, 1941, but no change was ever made in the percentages of participation therein. In 1941 defendant put on an eight-hour night shift and plaintiff was promoted from his job as a rougher to that of night-turn roller on this shift, a position which he retained until June 6, 1946 when he resumed his former position as rougher under Dunbar.

During the period of plaintiff's services as night-turn or "turn" roller, instead of receiving 28½% of the earnings of the mill he received only 23½%, the difference of 5% being paid as additional compensation to Dunbar, the day or boss roller. To recover this deduction from the amount to which he contends he was entitled plaintiff brought the present suit in assumpsit; his claim is for $3,724.78, covering the period from March 1, 1942, at which time he had filed a "grievance report", to June 6, 1946, when he ceased his employment as turn roller. At the trial the only testimony presented was that of plaintiff and his witnesses, and there is no disagreement between the parties as to the basic facts determinative of the issue here involved.

Plaintiff bases his action upon the agreements between defendant and the Union and also upon a decision of an arbitrator in 1944 which is hereinafter referred to. The first question that naturally arises is whether he comes within the scope of those agreements and can claim any right thereunder. All of them provided that they pertained to members of the Union employed in defendant's plant, but with the express *exclusion* of "Foremen, Assistant Foremen or Supervisors in charge of any classes of labor, or Watchmen, or any salaried employes who do no production or maintenance work". As the court below indicated it is extremely doubtful, to say

the least, whether plaintiff, as a turn roller, was not a supervisor in charge of the "class of labor" which constituted his crew. In his own testimony he repeatedly stressed the fact that his functions and duties as turn roller were entirely the same as those of the boss roller on the day shift, that he had the same charge of the men working for him as Dunbar had for *his* crew and that they were required to follow his instructions; in his amended statement of claim he expressly averred that "There is no essential difference between the work performed by the rollers working on the . . . night shifts and the rollers working on the day shift . . ."; one of his witnesses testified that plaintiff "exercised every function that the day roller exercised." As to the status of the day roller, plaintiff testified that Dunbar was in charge of the mill, that he directed the members of the crew as to the work they were to do and how to do it; there can be no doubt therefore that the boss roller was a supervisor within the meaning of the collective bargaining agreements and therefore excluded from their operation and protection, and if, as plaintiff insists, his own functions and authority were the same as those of the boss roller it would necessarily follow that he too fell within the class excluded by the express terms of the agreements and therefore cannot support his present claim on the schedule of percentages therein prescribed and which would be binding on defendant only as to the 71½% to be distributed among the other members of the crew, leaving the remainder for such disposition as might be agreed upon by defendant and the rollers themselves.

If, contrary to what has been thus stated, plaintiff's status was *not* the same as that of the boss roller, his claim meets with the alternative difficulty that the term "roller" as used in the agreements would not, in that event, apply to his own position as a turn roller. In his testimony he frankly admitted that he was aware that

the practice had existed during the entire time he had been in defendant's employ of turn rollers paying, out of their own share, a portion of the earnings of the mill to the day rollers as compensation for the aid and instruction which the latter furnished to the rollers on the night shifts. He admitted that he knew that in accordance with this practice he was to receive only 23½%, not 28½%, and that the remaining 5% was to be paid to Dunbar; he stated that this was explained to him and that he understood it. Inasmuch as he also admitted that he was fully conversant with the terms of the 1940 collective bargaining agreement, and that, notwithstanding it, he was to receive only 23½%, he clearly conceded, by necessary implication, that the term "roller" therein had not been meant to cover a turn roller.

On March 1, 1942 plaintiff, together with other turn rollers, filed a "grievance report" asking for the elimination of the 5% taken away from them and given to the day rollers. The basis of their complaint, as stated by them, was, not that the practice was in violation of the Union agreements, but that Dunbar and Wilkes (the latter being the roller in the other mill) had not properly helped them when they needed assistance. The grievance committee of the Union took the matter up with the Company and ultimately an arbitrator was appointed to whom was submitted the question: "Should the night-turn rollers be compelled to pay the daylight rollers 5% of their earnings?" While the arbitrator answered this question in the negative he held that he had no authority to decide as to what would be a fair and acceptable adjustment of tonnage rate payment to rollers and therefore he remanded the matter to the parties "for negotiation and agreement." Plaintiff cannot depend for support on this decision since the arbitrator had neither the power to make, nor did he make, any award; all that he professed to decide was that the arrangements

whereby the day rollers were paid the extra 5% should be changed, but changed only by negotiation and agreement between the Union and the Company. No such negotiation was held nor any such agreement ever effected.

It is clear, from every aspect of the case, that plaintiff is not entitled to recover the 5% of the earnings claimed by him, and the court below was correct in so holding.

Judgment affirmed.